Darrell BARKER, Defendant-Appellant,
v.
Robert D. COLE, Plaintiff-Appellee,

B & B Industries, Inc., William Watkins
and James Cornell,
Defendants-Appellees.

No. 3–677A157.

Court of Appeals of Indiana,
Third District.

Nov. 29, 1979.

Rehearing Denied Feb. 5, 1980.

John E. Hughes, Hoeppner, Wagner & Evans, Valparaiso, for defendant-appellant.

Leo J. Clifford, William G. Conover, Valparaiso, for defendants-appellees.

GARRARD, Presiding Judge.

On December 6, 1972, at approximately six o'clock a. m., William Watkins, an employee of B & B Industries, Inc., was driving a semi-tractor trailer east on U.S. Route 30. Watkins was traveling in the driving lane at approximately 60 miles per hour.[1] He checked the highway in front of him and could see no traffic. He then glanced skyward for two to three seconds to check the weather. When he looked back at the road a Ford Torino was directly in front of him, so close that the truck's headlights illuminated the interior of the Torino. Watkins swerved to avoid the Torino but was unable to do so, striking it in the rear. After the collision the tractor-trailer crossed the westbound lanes of U.S. 30 and struck one or two trees located on the north berm of the westbound lanes. The Torino, driven by appellant Darrell Barker, traveled across the median separating the east and westbound lanes and struck a van traveling west, driven by appellee Robert D. Cole, head on. Subsequently, James Cornell's vehicle, also traveling west, struck the wreckage of the Torino and the van.

Cole brought suit against Watkins, B & B Industries, Barker and Cornell to recover

---

1. The speed limit on U.S. 30 at the time was 65 mph.

damages for injuries suffered in this accident. The jury returned a verdict against all defendants except James Cornell and awarded Cole $50,000 damages. Barker appeals raising the following issues:

1. Whether the trial court erred in refusing to grant a hearing to determine the bias of a juror;

2. whether the trial court erred in instructing the jury to consider permanent injury, past and future medical expenses, past and future loss of earnings and future pain and suffering when the evidence did not support these elements of damages;

3. whether the trial court erred in admitting the testimony of James Cornell concerning his wages;

4. whether the verdict was excessive;

5. whether there was sufficient evidence to sustain a finding of negligence against Barker;

6. whether the trial court erred in refusing to reduce the judgment in the amount prepaid by Watkins and B & B Industries;

7. whether the trial court erred in refusing to reduce the judgment in the amount paid by Watkins and B & B

Industries under a loan agreement and covenant not to execute;

8. whether the trial court erred in allowing the jury to take the exhibits into the jury room; and

9. whether the trial court erred in permitting opposing counsel to ask a question in cross-examination which assumed the existence of facts not in evidence.

*Issue I:*

■ During voir dire of the jury, counsel asked the prospective jurors if any of them knew any of the parties. Juror Arthur Laederach, later elected foreman, answered that he knew Cole because Cole had moved furniture for him about fifteen (15) years prior to trial. Laederach stated that theirs was a "nodding acquaintance." [2]

Four (4) days after the verdict was rendered Barker discovered that Laederach's daughter was married to Cole's brother. This information was brought to the trial court's attention in Barker's motion to correct errors. Barker asserts on appeal that the court should have held a hearing to determine the bias of Laederach. We agree.

2. "MR. CONOVER: I believe Mr. Laederach you indicated you knew Bob Cole?

MR. LAEDERACH: Yes.
MR. CONOVER: How do you come to know Bob?
MR. LAEDERACH: Well, many years ago he moved me from one home to another. He was in the trucking business. That's the extent of my ----
MR. CONOVER: Now, would there be anything from that experience that would tend to make you more favorable to Bob Cole or against these defendants?
MR. LAEDERACH: None, none whatever.
MR. CONOVER: Conversely, there's nothing there that would prejudice you against Bob if he did a good moving job, I hope.
MR. LAEDERACH: No."
(Transcript pp. 419–420)
"MR. STONER: Mr. Laederach, I take it that your furniture that was moved wasn't scratched or anything?
MR. LAEDERACH: Beg your pardon?
MR. STONER: Mr. Cole didn't scratch your furniture or anything, you remember that?
MR. LAEDERACH: No.

MR. STONER: All right. Did a pretty good job moving, did he?
MR. LAEDERACH: He was satisfactory.
MR. STONER: Do you remember who he was working for at that time or was he working for himself?
MR. LAEDERACH: I think he was working for himself as I recall.
MR. STONER: About when was that if you can recall?
MR. LAEDERACH: About fifteen years ago probably.
MR. STONER: That would have absolutely no bearing ---
MR. LAEDERACH: No way whatsoever."
(Transcript p. 422)
"MR. GALVIN: Now, it's been awhile, as I understand it, since the plaintiff did some work for you. Have you known him at all say in the last fifteen years other than ---
MR. LAEDERACH: Just nodding acquaintance.
MR. GALVIN: See him around town and that sort of thing?
MR. LAEDERACH: Yes."
(Transcript pp. 428–29)

In *Barnes v. State* (1975), 263 Ind. 320, 330 N.E.2d 743, a juror on voir dire denied having relatives on the prosecutor's staff. In fact, the juror's wife's second cousin was a member of the staff with some connection with the case. It was held that this inaccurate response presented a possibility of bias. The cause was remanded to the trial court to determine whether the juror had been aware of the relationship either during voir dire or thereafter prior to verdict and whether the appellant or his attorney were aware of the relationship prior to the verdict. The possibility of bias was sufficient to require that appellant be afforded an opportunity to explore the juror's prejudices so as to challenge for cause if bias existed.

In *Stevens v. State* (1976), 265 Ind. 396, 354 N.E.2d 727, the court held that the trial court should declare a mistrial if bias is found to be present.

 In this case Laederach failed to disclose a personal relationship with the plaintiff Cole when specifically asked how he came to know Cole. The trial court, after discovery of a relationship which presented a possibility of bias, should have held a hearing to determine whether Laederach was aware of this relationship at any time prior to verdict. We must therefore remand this cause for such an evidentiary hearing. The court should allow Barker to challenge Laederach for cause and should declare a mistrial if bias is found to be present. The court should also determine whether Barker or his attorney was aware of the relationship prior to verdict. If so, then the challenge for cause is waived if Barker did not promptly inform the court and challenge the juror.

*Issue II:*

Barker contends that the evidence will not support an instruction on impairment of earning capacity.

 Impairment of earning capacity has been defined as the impairment of ability to engage in one's vocation as distin-guished from loss of earnings. There must be evidence of probative value which relates the injury to the inability to engage in one's vocation. The measure of damages is the difference between the amount which the plaintiff was capable of earning before the injury and the amount he is capable of earning thereafter. There must be evidence which will permit the jury to arrive at·a pecuniary value of the loss. *Scott v. Nabours* (1973), 156 Ind.App. 317, 296 N.E.2d 438.

 The evidence here revealed that Cole had been a union and non-union over-the-road truck driver most of his life prior to the accident. He had been laid off from his last job as an over-the-road driver in 1971 due to a change in the company's trucking operation. Cole did not seek a similar position at that time because his wife was extremely ill and he did not want to leave her at home alone. Cole obtained employment driving a delivery van. In January of 1972, Cole was examined by Dr. Makovsky and was found to be physically able to drive an over-the-road truck.[3]

Dr. Makovsky testified that Cole is now unable to drive a truck but if not for the accident he could have obtained a truck driving position. Mrs. Cole's health has improved and Cole would seek such a position if not for his injury. He received several offers of employment as an over-the-road truck driver after his wife's health improved but after he suffered his injury.

As a union truck driver in 1970, Cole earned $5.70 an hour, working an average of sixty hours per week. He also received between 14.4 cents and 15.7 cents per mile and averaged 2,500 miles per week. However, Cole did not work in the winter months. At the time of the accident Cole was earning $140 per week. At the time of trial, he was earning $200 per week. The evidence also revealed that the union and non-union over-the-road truck drivers who testified earned between $3.50 and $6.25 per hour in 1972 and between $3.60 and $8.20 at the time of trial. The union wage scale at

---

3. This examination was required at definite intervals by the I.C.C.

the time of trial was $7.85 based on a 40 hour week.

This evidence is sufficient to support a finding of impaired earning capacity and adequately enables the jury to arrive at the pecuniary value of the loss.

[redacted] Barker also contends that there was no evidence as to permanent injury, loss of wages, past and future medical expenses and future pain and suffering. Our review of the record does not support this contention.

Dr. Armalavage testified that the accident aggravated a degenerative arthritic condition in the lower back and hips. Cole now suffers a 10% permanent disability to the individual as a whole as a result of the aggravation. Dr. Makovsky testified that the condition was progressing into fibrositis and would not improve but would get worse. He further testified that Cole suffered from muscle spasms in his lower back and would continue to experience pain in the future. He prescribed Bufferin and application of heat for the pain. Cole is also taking Indocin for the arthritic condition.

Cole was unable to work for approximately two (2) months after the accident and he spent one week in the hospital. His medical bills were introduced into evidence. Thus, it is clear that there was some evidence on each element of damage.

*Issue III:*

[redacted] James Cornell was allowed to testify over Barker's objection as to his wages as a truck driver for American Oil Company. Barker asserts that this evidence was irrelevant and immaterial.

Although Cornell was a union truck driver, American Oil Company negotiated a separate contract with the union. It was not an industry-wide contract. In addition, Cornell had 15 years' seniority with the company.

Cole had never worked for American Oil nor had he worked under a similar contract. However, prior to the accident Cole was a qualified union over-the-road truck driver. The injuries suffered in the accident prevented him from engaging in this type of work. The evidence of Cornell's wages was relevant to show the wages earned by one employed as a truck driver. The differences between Cornell's employment and that of Cole went only to the weight of the evidence. These differences in contract, seniority and type of trucks driven were presented to the jury. Barker was not harmed by the admission of this evidence.

*Issue IV:*

[redacted] Barker next contends that the jury award of $50,000 was excessive. Indiana courts have set a strict standard of review for appeals predicated upon the excessiveness or insufficiency of awarded damages. A verdict will be reversed only when it is apparent from a review of the evidence concerning the injuries that the amount of damages assessed by the jury is so small or so great as to indicate that the jury was motivated by prejudice, passion, partiality or corruption or considered some improper element. *Henschen v. New York Central R. R. Co.* (1945), 223 Ind. 393, 60 N.E.2d 738; *Walker v. Jennings* (1975), 164 Ind.App. 554, 330 N.E.2d 134; *Wynder v. Lonergan* (1972), 153 Ind.App. 92, 286 N.E.2d 413; *Green v. Oakley* (1969), 145 Ind.App. 307, 250 N.E.2d 594.

[redacted] Cole suffered the following injuries in the accident: a brain concussion, a cracked socket of the eye, a broken nose, a broken jaw, a deep cut on his chin, five cracked ribs, a cracked breastbone, a broken toe, several lacerations on his legs and body, numothorax (air in the chest cavity outside of the lungs) and an aggravation of degenerative arthritis in hips and lower back. He suffered severe pain which gradually subsided except for pain in his lower back and hips. He has suffered a loss of movement in his hips which is more severe on his right side and has limitation in flexion of his spine. As a result of the aggravation of the arthritis, Cole is disabled 10%. The aggravation has prevented him from resuming his occupation as an over-the-road truck driver and will prevent him from lifting more then fifty pounds. Cole is unable to

drive for longer than twenty minutes at a time. His condition will worsen and he will continue to experience pain in his hips and lower back. In addition, Cole incurred medical expenses and lost two months' wages as a result of the accident. In the future, he will have to take aspirin and Indocin for the arthritis.

After reviewing this evidence we cannot say as a matter of law that the damages were so grossly and outrageously excessive as to induce the jury to believe that they were the result of prejudice, partiality or corruption.

*Issue V:*

■ Barker asserts that the evidence was insufficient to sustain a finding of negligence against him.

The evidence reveals that Watkins was traveling at approximately 60 mph in a 65 mph speed zone in the driving lanes of eastbound U.S. 30. Watkins glanced away from the road for 2–3 seconds after checking traffic in front of him. When he looked at the road again, Barker's automobile was immediately in front of him. Watkins did not know what lane he was in when he struck Barker's automobile in the rear. Barker testified that he pulled onto U.S. 30 from his girlfriend's driveway after coming to a complete stop and checking the traffic. He testified that he did not see any traffic. Barker testified that he pulled into the passing lane of U.S. 30 and accelerated to 50–55 mph. A police officer who investigated the accident determined that it occurred in the passing lane approximately 212 feet from the intersection of West Street and U.S. 30. The distance between the driveway and West Street was 500 feet. Thus, Barker accelerated to 50–55 mph from a dead stop in just under 300 feet. From this evidence, the jury could have drawn the inference that Barker failed to yield the right-of-way to oncoming traffic and that he was negligent in his failure to do so.

*Issue VI:*

As a result of the accident Cole incurred medical expenses and lost wages in the amount of $2,229.03. This sum was paid by Watkins and B & B Industries prior to trial.[4] Barker asserts on appeal that the trial court erred in not crediting this sum against the judgment of $50,000.

The Restatement of Torts § 885(3)[5] provides in part that:

"Payment made by one tortfeasor on account of a harm for which he and another are each liable diminish the amount of the claim against the other whether or not it was so agreed at the time of payment and whether the payment was made before or after judgment . . ."

■ Under elementary principles of tort law, a plaintiff is entitled to only one recovery for a wrong. Payments made in partial satisfaction of a claim must be credited against the remaining liability to prevent a double recovery. *Screen Gems-Columbia Music, Inc. et al. v. Metlis & Lebow Corp.* (2nd Cir. 1972), 453 F.2d 552; *Schumacher v. Rosenthal* (7th Cir. 1955), 226 F.2d 946; *Husky Refining Co. v. Barnes et al.* (9th Cir. 1941), 119 F.2d 715; *Wecker v. Kilmer* (1973), 260 Ind. 198, 294 N.E.2d 132; Prosser, *Handbook of the Law of Torts* (4th Ed. 1971), pp. 304–5.

■ Cole attempts to analogize this payment to payments from a collateral source. A joint tortfeasor, however, is *not* a "collateral source." The trial court erred in failing to credit $2,229.03 against the judgment.

*Issue VII:*

After the judgment was entered, B & B Industries, Watkins, Aetna Life and Casualty Co. (their insuror) and Cole entered into an agreement entitled "Loan Receipt

---

**4.** This prepayment was not made under a loan receipt agreement.

**5.** Restatement 2d of Torts is not cited because it expresses a different rule not acceptable to

the Indiana Supreme Court. *See Cooper v. Robert Hall Clothes, Inc.* (1979), Ind., 390 N.E.2d 155.

Agreement and Covenant not to Execute." Barker contends that the agreement is merely a covenant not to execute and that he is entitled to a pro tanto credit on the judgment of the amount received under the agreement.

■■■ We look to the express terms of the agreement to determine the intent of the parties as to the true nature of the agreement. *American Transport Co. v. Central Indiana Railway Co.* (1970), 255 Ind. 319, 264 N.E.2d 64.

■■■ This agreement was made after judgment when the exact amount of the liability was known to the parties. In addition, the parties were aware that Barker was contemplating an appeal.

In order to provide Cole with funds needed to support himself and his family during the pendency of the appeal and to limit the liability of the signing tortfeasor, the agreement was entered into. Under the agreement Cole received a loan, without interest, of $25,000. He agreed to not execute judgment or seek further payment from the signing tortfeasors and to pursue Barker for the full amount of the judgment. To the extent that recovery from Barker exceeded $25,000, Cole agreed to repay the loan. If Cole was unable to recover more than $25,000 or if the appeal was successful and he chose not to retry the case, no repayment of the loan was required. The agreement stated that the parties understood the law of Loan Agreements and expressed the intention that this agreement come within the purview of that law.

We hold that the agreement in this case was a loan receipt agreement and is controlled by the holding in *American Transport Co. v. Central Indiana Ry. Co.* (1970), 255 Ind. 319, 264 N.E.2d 64. It did not constitute a partial payment or satisfaction of the judgment. Barker is not entitled to a pro tanto credit of $25,000 on the judgment. Cole is entitled to proceed against him for the full amount of said judgment.

■■■■ Barker objects that the enforcement of the agreement shifts the entire burden of the jury's verdict onto his shoulders. It is well settled under Indiana law that a joint tortfeasor is not entitled to contribution from other tortfeasors. A plaintiff has the option of proceeding against only one of the joint tortfeasors or after obtaining judgment against all, to levy execution against only one of several joint tortfeasors. The agreement in this case is simply an exercise of that option to levy execution against one tortfeasor. To the extent it effects contribution, that effect was authorized by the Supreme Court in *American Transport Co., supra. See Northern Indiana Public Service Co. v. Otis* (1969), 145 Ind.App. 159, 250 N.E.2d 378.

The trial court did not err in refusing to credit $25,000 against the judgment.

*Issue VIII:*

■■■ Barker argues that the trial court erred in allowing the jury to take Exhibit No. 1 into the jury room during deliberation. It is within the trial court's sound discretion to determine whether to permit the taking of documentary evidence or exhibits other than depositions into the jury room. *Thomas v. State* (1972), 259 Ind. 537, 289 N.E.2d 508.

■■■ Exhibit No. 1 is an aerial photograph of the scene of the accident. It was admitted into evidence without objection. The jury was apprised that the photograph was taken under different lighting conditions than existed at the time of the accident; that a road is shown that was not in existence at the time of the accident; and that the photograph distorted the distances between certain points in the photograph. We hold that the trial court did not abuse its discretion in allowing the jury to take Exhibit No. 1 into the jury room along with other exhibits.

*Issue IX:*

Barker objected at trial to the following question asked on cross examination:

"Now Mr. Hughes indicated something to the effect that if you hadn't looked up to the sky, this accident wouldn't have happened. If this Torino hadn't pulled out in front of you, this accident wouldn't have happened either?"

Barker argues that the trial court erred in overruling his objection that there was no evidence that the Torino pulled out in front of him.

■■■ The extent to which cross examination may be carried is largely within the discretion of the trial court and a cause will not be reversed unless it appears there has been an abuse of discretion to the injury of the complaining party. *LaNoux v. Hagar* (1974), 159 Ind.App. 646, 308 N.E.2d 873. We find that the court did not abuse its discretion in this instance.

■■■ It is true that a question propounded to a witness should not assume the existence of facts not proven or admitted. *Pennsylvania Co., supra; Essex v. Millikan* (1928), 88 Ind.App. 399, 164 N.E. 284. However, in this case the evidence established that the Torino did pull out on to U.S. 30 in front of the truck driven by Watkins. The issue was when he pulled out (how far in front of the truck) and into what lane. There was no prejudicial error in allowing the question.

Cause remanded for hearing on the bias of Juror Laederach. If the court finds that there was no bias, the judgment must be reduced by $2,229.03 and is affirmed in all other respects.

HOFFMAN, J., concurs.

STATON, J., dissents and files separate opinion.

STATON, Judge, dissenting.

I dissent. I am unable to join in the majority's application of existing Indiana case precedent to the "Loan Receipt Agreement and Covenant Not to Execute" at issue in this cause.

The majority acknowledges the validity of Barker's contention that the enforcement of the agreement effectively shifts the entire burden of the jury's $50,000.00 verdict from Watkins and B & B Industries (and their insurer) to his shoulders That effect, the majority blithely explains, is authorized by the Supreme Court's holding in *American Transport Co. v. Central Indiana Ry. Co.* (1970), 255 Ind. 319, 264 N.E.2d 64.

I do not dispute that the Court's opinion in *American Transport Co.* supports the result reached by the majority. That result, however, imposes a manifest injustice upon joint tort-feasor Cole, who under existing Indiana law, *has no right of contribution from his fellow joint tort-feasors*, Watkins and B & B Industries. *Jackson v. Record* (1937), 211 Ind. 141, 5 N.E.2d 897; *see also,* 6 I. L. E. Contribution § 3, p. 331 (1958). Moreover, the readily-apparent ramifications of the majority's application of case precedent to the facts before us are simply not consonant with the ends of justice. The upshot of the majority's holding is to shift the entire pecuniary responsibility for the jury's verdict to a fellow joint tort-feasor with lesser financial resources.

Under the terms of most loan receipt agreements, the tender of money to an injured party carries with it the possibility that no recoupment of the sum will occur. *American Transport Co. v. Central Indiana Ry. Co., supra,* at 67. Where the loan receipt agreement is executed *after* a verdict has been reached, however, much of the uncertainty of recoupment vanishes. At that point, two contingencies remain which could bar the potential recovery of the loan; (1) a successful appeal by the joint tort-feasor who is to bear the entire brunt of the jury's verdict; and (2) the financial inability of that joint tort-feasor to satisfy the entire verdict. Both matters are much more susceptible to accurate prognosis than those questions which cloud the possibility of recoupment of a sum tendered as part of a pre-trial loan receipt agreement: (1) will the jury find the joint tort-feasor liable? and (2) if so, what is the amount of the verdict that the jury will return against the joint tort-feasor? Thus, in a pre-trial setting, the placement of a sum of money at an injured party's disposal involves significant risk; *in a post-trial setting, however, the act becomes a calculated risk*—a matter of gamesmanship.

To play the game—to offer the damaged party a sufficiently attractive sum of money as part of a loan receipt proposition—re-

quires immediate access to funds. Absent that financial ability, a joint tort-feasor, under our present rules of law, faces the possible imposition of the entire pecuniary consequences of the cumulative effect of his and another's negligence, without regard to his comparative degree of causation.

The result is antithetical to the public policy which has prompted judicial willingness to sanction loan receipt agreements. The loan receipt agreement has the desirable effect of providing a damaged party with much needed financial resources in the face of the prolonged and costly legal battle which oftentimes precedes redress. *American Transport Co., supra*, at 67. At the same time, *in circumstances such as those before us*, our existing rules of law make the loan receipt agreement a vehicle whereby one economic inequity is cured by the creation of another.

This questionable result calls for a re-examination of our present legal principles with respect to this case. Notwithstanding the trend among many jurisdictions to veer from the long-standing doctrine that no right of contribution exists between joint tort-feasors[1], the abrogation of that rule would remove the incentive for a joint tort-feasor to enter into a loan receipt agreement—and thereby dry up a desirous source of funds for damaged parties. On the other hand, it is perhaps advisable that we question whether a post-verdict loan receipt agreement should remain an enforceable agreement under the laws of this state.

Post-judgment loan receipt agreements have been justified on the grounds that under Indiana law, a plaintiff is permitted to execute a judgment against only one of several joint tort-feasors. *American Transport Co., supra*. Regardless of the merits of that rule, its purposes are not served by a concomitant principle which makes a joint tort-feasor of greater economic resources more capable of avoiding execution. Moreover, the post-verdict loan receipt agreement has little of those qualities which make its counterpart, the pre-verdict loan receipt agreement, so attractive. While I do not doubt that a sudden post-verdict availability of funds may benefit a damaged party facing further delay in redress by virtue of a tort-feasor's appeal, it is also true that the damaged party may have already endured an extended trial process wherein his economic condition was ignored. This is not to say that the post-verdict financial straits of an injured party does not deserve our concern; rather, it is to acknowledge that there is little to honor in a post-verdict loan receipt agreement. It is a vehicle whereby a well-financed joint tort-feasor can, based upon a calculated risk, endeavor to avoid execution and shift the economic consequences of his actions to his fellow joint tort-feasor of lesser financial resources.

I am unable to countenance that result.

1. *See* Am.Jur.2d *Contribution* § 40, p. 59 (1965), and 60 A.L.R.2d 1377 (1958). The rule originated in 1799, when *Merryweather v. Nixan* (1799), 8 TR 186, 101 Eng.Reprint 1337 was decided. Generally, the rule is predicated on the theory that the law should not strive to adjust the burdens of misconduct for the benefit of a culpable wrongdoer. As explained in the above authorities, some states have abrogated the doctrine by statute, while others have created an exception to the doctrine in cases where the joint tort-feasors' actions did not rise above ordinary negligence.