

ATTORNEYS FOR APPELLANT

Timothy F. Devereux
Daniel A. Ladendorf
Ladendorf Law
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Rick D. Meils
Neil A. Davis
John W. Mervilde
Meils Thompson Dietz & Berish
Indianapolis, Indiana

ATTORNEY FOR THE *AMICUS CURIAE*

Alexander Jesus Limontes
Indiana Trial Lawyers Association
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Noe Escamilla, <br> *Appellant-Plaintiff,* <br><br> v. <br><br> Shiel Sexton Company, Inc., <br> *Appellee-Defendant.* | March 31, 2016 <br><br> Court of Appeals Case No. <br> 54A01-1506-CT-602 <br><br> Appeal from the Montgomery Superior Court <br><br> The Honorable Heather L. Dennison, Judge <br><br> Trial Court Cause No. <br> 54D01-1107-CT-562 |

**May, Judge.**

[1] In this interlocutory appeal from the trial court's pre-trial orders regarding the admissibility of evidence, the parties raise a number of broad policy questions regarding whether and how an injured plaintiff's status as an undocumented immigrant should impact that plaintiff's ability to recover future lost wages from an alleged tortfeasor. We decline their invitations to make sweeping pronouncements about the rights of immigrants, however, and rule narrowly on the evidentiary issues raised. Although we disagree with part of the trial court's reasoning, we affirm its denial of Noe Escamilla's motion *in limine* and its grant of Shiel Sexton's motion to exclude Escamilla's experts, and we remand for further proceedings in accordance with our opinion.[1]

## Facts and Procedural History

[2] Escamilla was born in Mexico. When he was a teenager, his parents moved the family, including Escamilla, to the United States. Escamilla lived with his family in Nevada and began working as a masonry laborer. At some point thereafter, he moved to Indiana, where he again found work with masonry companies. Escamilla had a social security number that he used to pay taxes on his income, but that number was not connected to him. He was, at that time, an undocumented immigrant working in the United States.[2]

---

[1] We heard oral argument on this cause at the Statehouse on January 6, 2016. We commend counsel for their insightful discussion of the relevant law and facts.

[2] In 2011, Escamilla married a United States citizen and together they now have three children who are United States citizens. Escamilla has now filed paperwork with the United States government requesting permission to remain in the country, but his petition remains pending.

[3] In December of 2010, Noe Escamilla, an employee of Masonry By Mohler, Inc., was assigned to work at a construction site where Shiel Sexton Company, Inc. was the general contractor. On December 9, while part of a crew lifting a heavy piece of stone, Escamilla slipped on ice and was injured. Doctors permanently restricted Escamilla from lifting more than twenty pounds, which prevents his continued employment as a masonry laborer.

[4] Escamilla sued Shiel Sexton, seeking medical expenses, lost wages, and future lost income. He planned to call expert witnesses to testify his injuries had permanently impaired his earning capacity as a masonry laborer in the United States. Escamilla then filed a motion *in limine* to prevent mention of his immigration status. Shiel Sexton moved to exclude the expert witnesses Escamilla planned to call because those experts would testify only about the income Escamilla could have made in the United States as a masonry laborer. Shiel Sexton asserted testimony about Escamilla's earning capacity should be limited to the income he could earn in Mexico, which is his country of origin, because Escamilla had no legal right to reside or work in the United States at the time of his accident.

[5] The trial court denied Escamilla's motion *in limine* and granted Shiel Sexton's motion:

> Escamilla is a citizen of Mexico. He is not a legal resident of the United States and has no legal authority to hold employment in the U.S. Though there is evidence that suggests that he intends to remain in the U.S. as long as he is permitted, even his own witness concedes that he **may** be permitted to remain in the

country after his pending application is approved.[3]  Additionally, he has not even filed a formal request for permission to work in the United States.  Thus, he would be precluded from mitigating his claim for lost future wages in this matter since he cannot legally work in the United States.  Moreover, it is evident that Escamilla violated federal law in order to secure employment with the Company by providing false documentation of his ability to be legally employed in the United States.

Both parties concede that there is no controlling Indiana law on-point.  The Court, having reviewed the law cited by the parties and other relevant cases, finds that the Supreme Court of the United States provided the best guidance in Hoffman Plastic Compounds, Inc., v. National Labor Relations Board, 535 U.S. 137 (2002).  In Hoffman, the employee was an illegal alien who had provided false documentation in support of his application for employment with Hoffman.  Thereafter, the employee was terminated for engaging in union organization practices and the National Labor Relations Board ("NLRB") ordered his reinstatement and the payment of back wages.  The Supreme Court reversed that decision, based on federal preemption and public policy.

Though the issues are not exactly the same, the analogy is instructive.  Much of the Hoffman decision is based on the fact that the employee had provided false documentation of his ability to work in the United States, which is criminalized by IRCA, the Immigration Reform and Control Act.  The court determined that an employee who was "never lawfully entitled to be present or employed in the United States" is not entitled to claim back pay.  535 U.S. at 146.  Further, allowing the payment of back wages "not only trivializes the immigration laws, it also

[3] Long after the incident giving rise to this matter, Escamilla sought permission from the United States Government to remain in the country.  At the time of oral argument, the application was pending.

condones and encourages future violations." Id. at 150. The cases relied upon by Escamilla are distinguishable wherein there was no allegation that the employee had provided false documentation of his ability to be present or to be employed in the United States. Such is not the case here. Clearly, Escamilla's immigration status is relevant to the issue of damages on his claim for lost future income. Therefore, the jury should be entitled to hear evidence regarding Escamilla's immigration status and his motion in limine should be and hereby is DENIED.

Company next argues that Escamilla should be precluded from presenting evidence by his proffered experts, Sara Ford and Ronald Missun. Based upon the Wielgus case, cited by both parties, Escamilla's ability to recover for lost future wages is limited to "what he could legitimately earn in his country of lawful residence." Wielgus v. Ryobi Technologies, Inc., 875 F. Supp.2d 854, 862 (N.D. Ill. 2012). Thus, Escamilla's claim for lost future income is limited to what he could legitimately earn in Mexico, his **country of lawful residence** and any evidence regarding potential future earnings in the United States would be inadmissible.

Sara Ford has apparently not considered what Escamilla's legitimate earnings might be in Mexico. Rather, she has based her projections on what he could earn in the United States. However, since he is not legally permitted to work in the U.S., and because he supplied false documentation of his ability to do so, he is precluded from going forward on a claim for future lost income in the United States. Accordingly, her testimony is not relevant and shall be EXCLUDED.

Likewise, Escamilla seeks to have Ronald Missun testify regarding the present value of the future lost wages based on Sara Ford's irrelevant calculations of United States earnings.

> Therefore, his testimony is also not relevant and shall be
> EXCLUDED.

(App. at 200-02) (footnote and emphases in original). The trial court certified that order for interlocutory appeal and we accepted jurisdiction.[4]

# Discussion and Decision

[6] Escamilla appeals the trial court's *in limine* order that: (1) evidence of his immigration status would be admissible, and (2) expert testimony about "future lost wages" based on what he could have made working in the United States would not be admissible.[5] Orders *in limine* are "not a final determination of the admissibility of the evidence referred to in the motion." *State v. Lewis*, 883

---

[4] In its Brief of Appellee, Shiel Sexton asserts we should strike pages 238-263 of Escamilla's Appendix of Appellant, because those documents were not presented to the trial court. Generally, we consider only evidence and arguments presented to the trial court when we review the correctness of a trial court's decision. *See*, *e.g.*, *Luster v. State*, 578 N.E.2d 740, 746 (Ind. Ct. App. 1991) ("An appellant may not attempt to build a new record on appeal to support his position with evidence that was never admitted in the court below."). Because the pages to which Shiel Sexton points do not appear to have been provided to the trial court during the pre-trial proceedings, we may not consider them on appeal and we strike them from the Appendix of Appellant. *See Chesterfield Management, Inc. v. Cook*, 655 N.E.2d 98, 101 (Ind. Ct. App. 1995) (striking from Appendix documents that had not been placed before trial court).

[5] Escamilla also challenges as unsupported by the record the following factual finding in the trial court's order: "Moreover, it is evident that Escamilla violated federal law in order to secure employment with the Company by providing false documentation of his ability to be legally employed in the United States." (App. at 200.) There seems to be no disagreement that Escamilla filed his taxes on the income earned at Masonry By Mohler using a social security number that was not his. But the Record before us includes no evidence he "provid[ed] false documentation" to Masonry By Mohler. (*Id.*) Thus, we agree that finding is unsupported by the Record.

The trial court relied, in part, on that finding when it determined Escamilla was "precluded from going forward on a claim for future lost income in the United States," (*Id.* at 202), "because he supplied false documentation of his ability to" work in the United States. (*Id.* at 201-02.) Nevertheless, we need not reverse because that finding is harmless. App. R. 66 (appellate court does not reverse for harmless error). Escamilla's ability to claim future lost earnings is controlled by his ability to demonstrate, at the time of trial, whether and where he can work. Thus, the court's finding about the past is of no consequence and we need not reverse based thereon.

N.E.2d 847, 851 (Ind. Ct. App. 2008). Nevertheless, pursuant to Indiana Appellate Rule 14(B), we have jurisdiction to review *in limine* orders if the trial court certifies the order for appeal and we accept jurisdiction. *Id.* Both of those procedural pre-requisites are met and we have jurisdiction to review the pre-trial order. *See id.*

> The granting or denying of a motion *in limine* is within the sound discretion of the trial court. The granting of a motion *in limine* is an adjunct of the inherent power of trial courts to admit and exclude evidence. We apply the standard of review applicable to questions concerning the admission of evidence, that is, abuse of discretion. An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court.

*Id.* (internal citations and quotations omitted).

[7]     As a preliminary matter, we note a trial court's evidentiary rulings are controlled by the Indiana Rules of Evidence. Pursuant to those rules, "[i]rrelevant evidence is not admissible" and save a few exceptions, "[r]elevant evidence is admissible." Evid. R. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Evid. R. 401. A trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Evid. R. 403.

The parties disagree about the types of evidence that should be admissible to prove Escamilla's claim for future lost wages based on his impaired earning capacity. "The gist of the element of impaired earning capacity is a showing of adverse effect on a plaintiff's vocation." *Montgomery Ward & Co. v. Gregg*, 54 N.E.2d 1145, 1164 (Ind. Ct. App. 1990), *reh'g denied*, *trans. denied*. One may recover such damages if an injury "causes a career change" or precludes a preferred field of employment. *Id*. Calculating damages for impaired earning capacity involves assessing "the difference between the amount which the plaintiff was capable of earning before the injury and the amount which he is capable of earning thereafter." *Scott v. Nabours*, 156 Ind. App. 317, 321, 296 N.E.2d 438, 441 (1973).

Proving impaired earning capacity requires "more than mere proof of permanent injury and pain." *Id*. at 320, 296 N.E.2d at 441. A plaintiff must also present "evidence of probative value which relates the injury to an inability to engage in one's vocation." *Id*. at 320-21, 296 N.E.2d at 441. "Like other damage issues this issue may be proven by both expert and non-expert testimony." *Id*. at 321, 296 N.E.2d at 441. But the evidence must "permit the jury to arrive at a pecuniary value of the loss." *Barker v. Cole*, 396 N.E.2d 964, 968 (Ind. Ct. App. 1979), *reh'g denied*. The jury may not be left to arrive at its decision based on speculation and conjecture. *Kirk v. Harris*, 173 Ind. App. 445, 449, 364 N.E.2d 145, 148 (1977), *reh'g denied, superseded on other grounds by* amendment of Trial Rule 38.

Shiel Sexton asserts evidence of future wages Escamilla could have earned in the United States is speculation because Escamilla has no legal right to work in the United States. Escamilla notes he has never worked in Mexico and has no intention of returning to Mexico, so testimony of future wages in Mexico is also speculative.

The "amount that the injured party would have earned but for the injury is not susceptible to precise measurement in a personal injury action involving a claim for lost,[sic] future earning capacity." 22 Am. Jur.2d § 166 (2013). *See also Republic Waste Servs., Ltd. v. Martinez*, 335 S.W.3d 401, 407 (Tex. App. 2011) ("The amount of income that may be earned in the future by a plaintiff or, as in this case, by a decedent is always uncertain, and must be left largely to the judgment and discretion of the jury.").

The inability to measure precisely is not unique to Escamilla or to undocumented immigrants. *See*, *e.g.*, *Berman v. Cannon*, 878 N.E.2d 836, 842-43 (Ind. Ct. App. 2007) (in which economics professor testified about the lost earning capacity of a homemaker with no prior employment history). *And see Rieth-Riley Const. Co. v. McCarrell*, 163 Ind. App. 613, 620, 325 N.E.2d 844, 849 (1975) (holding difficulties in measuring lost wage damages for plaintiff unemployed at the time of the injury does not preclude recovery of lost wages). Precise measurement is not possible because "the measure of the plaintiff's decreased capacity to earn money requires a prediction as to future impairment," 22 Am. Jur.2d § 154, life expectancy, and the job market, among other factors.

[13] This inability to foresee the future is why "[t]here is no fixed rule for estimating the amount of damages to be recovered for loss or diminution of earning capacity." *Id*. at § 159. Rather, the issue is left to the jury, which is expected to award "fair and reasonable compensation" in light of the injured person's situation. *Id*. In order for a jury to award compensation that is fair and reasonable in light of the circumstances, that jury must be presented all evidence of the plaintiff's circumstances that is relevant to making that determination:

> Although no general rule can be formulated that would properly control the admission of evidence to prove a person's future earning capacity, any evidence is admissible that would fairly indicate the person's present earning capacity and the probability of its increase or decrease in the future, including evidence of age, intelligence, habits, health, occupation, life expectancy, ability, probable increase in skill, and rates of wages paid generally to those following the person's vocation.

*Id*. at § 754. *See also id*. at § 159 (jury should consider "what the plaintiff's income would probably have been, how long it would have lasted, and all the contingencies to which it was liable").

[14] Because the amount of damages to award for lost future income is a question of fact historically left to the jury, we decline to determine as a matter of law where, but for his injury, Escamilla might have worked in the future.[6] *See*, *e.g.*,

---

[6] The trial court relied on *Hoffman Plastic Compounds, Inc., v. National Labor Relations Board*, 535 U.S. 137 (2002), in ordering Escamilla could not claim future income based on United States wage rates. *Hoffman* is

*Ayala v. Lee*, 215 Md. App. 457, 480 n.19, 81 A.2d 584, 598 n.19 (Md. App. 2013) ("we believe that a blanket rule prohibiting United States earnings improperly ignores the reality of a plaintiff's living situation, regardless of his or her legal status"). Instead, we defer to the jury's ability to weigh all the evidence presented by the parties at trial and to determine the "fair and reasonable compensation" due Escamilla in light of the probabilities of the multiple contingencies that exist. *See* 22 Am. Jur.2d § 159.

[15] A plaintiff's status as an undocumented immigrant is just another fact for the jury to consider as it makes its damages determination:

> The question of whether a party is entitled to United States earnings or home country earnings is a question of fact, because it necessarily depends on the jury determining the likelihood of whether or not the party will remain in the United States for the duration of the awarded compensation. In other words, if it is unlikely that a plaintiff will be deported or if he shows a long history of working in the United States, a Unites States pay rate is more appropriate. If there is evidence that the plaintiff is likely to return to his home country, whether by choice or by deportation, a country of origin pay rate is more appropriate.

distinguishable not just because of the factual differences discussed above, *see supra* n.3, but also because of the type of damages being awarded. The NLRB ordered Hoffman to "offer reinstatement and backpay" to a worker who could not legally work in the United States. *Hoffman*, 535 U.S. at 140. Escamilla is not being reinstated and his damages are not "wages;" rather, he is being compensated for his inability to continue the same kind of work he had been doing. *See Crenshaw v. McMinds*, 456 N.E.2d 433, 434 (Ind. Ct. App. 1983) ("It is not the actual lost future earnings that constitutes the damage element . . . . It is rather the loss of earning *capacity* that is the proper element of damages." (emphasis in original)), *reh'g denied*. *And see Ayala v. Lee*, 215 Md. App. 157, 477, 81 A.3d 584, 596 (Md. App. 2013) ("neither the [Immigration Reform and Control Act of 1986] nor *Hoffman* mandates denying awards of lost wages or medical expenses to undocumented immigrant employees solely because of their immigration status").

*Ayala*, 81 A.3d at 598 (internal citations omitted). *See also Ortiz v. Cooper Tire & Rubber Co.*, 2015 WL 1498713 at *6 (W.D. Okla. 2015) (holding recovery of compensatory damages by an undocumented alien is "a matter of factual proof").

With this legal landscape in mind, we turn to the two issues raised by the parties: whether the court abused its discretion by excluding the testimony of Escamilla's expert witnesses, and whether the court abused its discretion by permitting the admission of testimony about Escamilla's status as an immigrant.

## Expert Witnesses

The trial court ruled the evidence from Escamilla's proposed expert witnesses was not relevant because Escamilla's damages could not be based on United States wages when he could not work legally in the United States. As we have explained, a fact-finder may award damages for lost earning capacity to an undocumented immigrant based on United States wages if the evidence presented at trial supports such a finding. We therefore cannot affirm the trial court's decision based on its stated reason.

Nevertheless, we affirm the court's *in limine* order excluding Escamilla's experts and their report on another basis. At a deposition of one of those experts, Sara Ford, the questioning revealed Ford had not taken into account the fact that Escamilla was an undocumented immigrant:

Q      Did your analysis take into account whether or not he's a U.S. citizen?

A      No. My analysis accounts for federally mandated benefits, and I can see that he was paying into the tax program.

* * * * *

Q      You understand that he's not a U.S. citizen, correct?

A      I understand that.

Q      You understand that he could be deported. Yes?

A      I don't have a further understanding of how that works. I can't answer that question yes or no.

(App. at 34.) As such, the report Ford and Mussin prepared had not been adequately tied to the facts of Escamilla's case. *Cf. Ortiz v. Cooper Tire & Rubber Co.*, 2015 WL 1498713 at *8-9 (W.D. Ok. 2015).

[19]   In *Ortiz*, a van wrecked and an injured passenger, Morales, requested damages for lost future wages. He hired experts to testify thereto. Cooper Tire asserted the expert opinions as to lost future wages should be excluded as "unreliable because they fail to account for factors that are unique to Carlos Morales, such as his immigration status, illegal United States employment, and possible deportation or voluntary return to Guatemala." *Id*. at *7.

[20] To support the admissibility of the expert's opinion, Morales filed an affidavit from his expert, and the court provided the following description of the affidavit in its opinion:

> [The expert] explains his decision to utilize wage rates from employment at National Beef Packing Company based on immigration statistics regarding undocumented workers in the national economy, Mr. Morales' employment history and past behavior, a "statistically insignificant" possibility of deportation, and a lack of evidence that Carlos Morales would have considered returning to Guatemala if the accident had not occurred. After considering relevant economic factors, [the expert] concludes that "more likely than not, the earning capacity Mr. Morales lost due to the accident prevented employment which otherwise would have occurred in the United States, notwithstanding his civil immigration status."

*Id.* (internal citations omitted). The court held the expert's report was admissible because the affidavit "reliably linked" the expert's opinion to the facts of the case at hand. *Id.*

[21] The report prepared in support of Escamilla's claim had no such support. Rather, the expert testified she had not given any consideration to his status as an undocumented immigrant or the impact that fact might have on his claim. Thus the report was inadequately tied to the facts of Escamilla's case to be admissible.

### Immigration Status

[22] The trial court ruled it would not exclude evidence of Escamilla's status as an immigrant because "Escamilla's immigration status is relevant to the issue of

damages on his claim for lost future income." (App. at 200.) As is true with all forms of evidence, Escamilla's status as an immigrant should be excluded if it has no relevance, or if the risk of prejudice outweighs its probative value. Evid. R. 403. *See also Crenshaw v. McMinds*, 456 N.E.2d 433, 434 (Ind. Ct. App. 1983) (trial court committed reversible error by admitting evidence of decedent's felony conviction when that fact was not relevant to decedent's lost earning capacity and was highly prejudicial), *reh'g denied*.

[23] Shiel Sexton acknowledges the relevance of a plaintiff's status as an undocumented immigrant depends on the specifics of that plaintiff's claim for damages:

> If . . . Escamilla is not allowed to introduce any lost future earnings claim, then Shiel Sexton cannot conceive of a basis on which it will introduce evidence of Escamilla's undocumented status. Even if the Court were to allow Escamilla to claim an entitled [sic] to loss [sic] future earnings at Mexican income rates only, then it is not clear how his immigration status would be admissible. Only if Escamilla is allowed to claim an entitlement to a loss of earning capacity at United States wages would Shiel Sexton seek to introduce evidence of Escamilla's apparent undocumented status.

(Br. of Appellee at 11.) We agree, and hold Escamilla's immigration status is relevant to a claim of lost earning capacity *only if*: (1) Escamilla claims lost earning capacity in United States wages, *and* (2) Escamilla's immigration status leaves him with any risk of deportation. *See, e.g.*, *Velasquez v. Centrome, Inc.*, 183 Cal. Rptr. 3d 150 (Cal. Ct. App. 2015) (evidence of immigration status is

irrelevant in personal injury action when plaintiff does not claim damages for lost earnings or earning capacity). *And see Ayala*, 81 A.3d at 597 ("Immigration status is relevant to a claim for lost wages for the simple reason that the legal ability to work affects the likelihood of future earnings in the United States.").

[24] Escamilla and the Indiana Trial Lawyers Association argue that, even if his immigration status is relevant, evidence of his status is so prejudicial in today's political climate that its probative value is outweighed by the prejudicial effect. We acknowledge that other courts have so held. *See*, *e.g.*, *Salas v. Hi-Tech Erectors*, 230 P.3d 583, 587 (Wash. 2010) (*en banc*) (holding evidence of immigration status was relevant to lost future earnings, but concluding "with regard to lost future earnings, the probative value of immigration status, by itself, is substantially outweighed by its risk of unfair prejudice").

[25] However, it is not apparent how Escamilla's trier of fact might accurately determine his future earning capacity without that knowledge, as it must determine whether to award lost earnings based on United States wages, Mexican wages, or some other standard. The prejudicial effect of that evidence therefore currently does not outweigh its probative value. As Escamilla is claiming lost earning capacity based on United States wages and has an immigration status that might leave him with some risk of deportation, we affirm the trial court's denial of Escamilla's motion to exclude evidence of his immigration status. Should Escamilla's immigration status change before trial, such that he no longer is at risk of deportation, then the trial court would need to reevaluate the relevance of the evidence in light of our analysis.

# Conclusion

[26] Based on the circumstances at the time of the trial court's order, we affirm the grant of Shiel Sexton's motion to exclude the testimony and report from Escamilla's expert witnesses, we affirm its denial of Escamilla's motion *in limine* to exclude evidence of his status as an undocumented immigrant, and we remand for further proceedings consistent with this opinion.

[27] Affirmed and remanded.

Bradford, J., concurs.

Baker, J., dissents with separate opinion.

Noe Escamilla,

*Appellant-Plaintiff,*

v.

Shiel Sexton Company, Inc.,

*Appellee-Defendant.*

Court of Appeals Case No.
54A01-1506-CT-602

**Baker, Judge, dissenting.**

When the plaintiff in a civil action is also an undocumented immigrant, the majority concludes that juries and experts cannot determine an appropriate award of damages for loss of future income without first considering the plaintiff's immigration status. I do not see how such evidence would be of any use in arriving at a more appropriate award of damages, and I believe that it will likely result in prejudice to the injured party and serve as a bad incentive for those who employ undocumented immigrants. I respectfully dissent.

Of the many factors that the majority recognizes as relevant to the calculation of damages for loss of future income, one's present immigration status is certainly the least relevant. This is in part because, unlike other factors, an

individual's ability to remain in this country is a function of the law, and historically, immigration law has been subject to substantial change. *See* Wendy Andre, *Undocumented Immigrants and their Personal Injury Actions: Keeping Immigration Policy Out of Lost Wage Awards and Enforcing the Compensatory and Deterrent Function of Tort Law*, 13 ROGER WILLIAMS U. L. REV. 530, 534-42 (2008) (discussing the historical development of U.S. immigration law). For instance, the Immigration Control and Reform Act of 1986 (IRCA) allowed previously undocumented immigrants who met certain criteria to become lawful residents. 8 U.S.C. § 1255a; *see* Kati L. Griffith, *A Supreme Stretch: The Supremacy Clause in the Wake of IRCA and Hoffman Plastic Compounds*, 41 CORNELL INT'L L.J. 127, 129 (2008) (noting that the IRCA gave amnesty to over a million undocumented immigrants). Such sweeping changes to immigration law could occur at any time. This means that an individual's current immigration status is not a reliable predictor of that individual's future immigration status.

[30] Even in the absence of any changes to the law, immigrants who remain undocumented face a remarkably low risk of deportation. *Salas*, 230 P.3d at 669. The Department of Homeland Security (DHS) estimated that 11.4 million undocumented immigrants resided in this country in 2012. DHS, ESTIMATES OF THE UNAUTHORIZED IMMIGRANT POPULATION RESIDING IN THE UNITED STATES: JANUARY 2012, (March, 2013) *available at* https://www.dhs.gov/sites/default/files/publications/ois_ill_pe_2012_2.pdf. In that same year, DHS removed an all-time high of approximately 419,000

undocumented immigrants. DHS, IMMIGRATION ENFORCEMENT ACTIONS: 2012, (Dec., 2013) *available at* https://www.dhs.gov/sites/default/files/publications/ois_enforcement_ar_20 12_1.pdf. This record number of removals amounted to only 3.7 percent of the total undocumented population. Removals are presently on a downward trajectory, with the number of undocumented immigrants removed by DHS falling to approximately 235,000 in 2015. DHS, ICE ENFORCEMENT AND REMOVAL OPERATIONS REPORT, (Dec. 22, 2015) *available at* https://www.ice.gov/sites/default/files/documents/Report/2016/fy2015remo valStats.pdf.

[31] However, this present trajectory says little about the likelihood that a particular immigrant will face deportation in any subsequent year. Apart from changes brought through legislation, one's ability to remain in this country will also depend on executive enforcement decisions. DHS has recognized that its ability to remove undocumented immigrants is limited and that it must exercise discretion in allocating its resources. Its current Secretary has promulgated a memorandum identifying certain undocumented immigrants as priorities for removal, including individuals deemed to be threats to national security or public safety. Memorandum from Jeh Johnson, Sec'y, DHS, to Thomas S. Winkowski, Acting Dir., U.S. Immigration and Customs Enforcement, et al. (Nov. 20, 2014), *available at* https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosec utorial_discretion.pdf. This means that little can be known about an

undocumented immigrant's chances of removal without knowing whether that person is currently a priority in the eyes of DHS.

[32] DHS has also issued guidance, which has been the subject of much recent discussion, known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). Memorandum from Jeh Johnson, Sec'y, DHS, to Leon Rodriguez, Dir., U.S. Citizenship and Immigration Services, et al. (Nov. 20, 2014), *available at* https://www.dhs.gov/sites/default/files/publications/14_1120_memo_deferred_action.pdf. Pursuant to DAPA, undocumented immigrants who meet certain criteria may be eligible for deferred action, meaning DHS will not seek to remove them for a period of time. *Id.* Qualified individuals may also be eligible for work authorization. *Id.* As amicus for Escamilla notes, forty-six percent of Indiana's undocumented population could apply for deferred action under DAPA. Brief of the Ind. Trial Lawyers Ass'n at 9. Thus, one would not want to predict the likelihood that an undocumented immigrant will remain in this country without first considering whether that person is eligible for DAPA. But, as of today, it would be premature to make any predictions related to DAPA, as the United States Supreme Court is set to hear a challenge to DAPA in April. *United States v. Texas*, 136 S.Ct. 906 (2016).

[33] Thus, because one's immigration status is defined by law, it is subject to sudden and often unpredictable change depending on decisions made across all branches of the federal government. Keeping this in mind, it seems clear that the only thing to be inferred from Escamilla's present immigration status is that

his chance of someday facing deportation is something above zero. I do not believe that juries would be able to put this information to any productive use, nor do I believe that it could—or should—affect the considerations of experts. It bears remembering that the experts in *Ortiz*, relied upon by the majority, found that the possibility that the plaintiff would be deported was "statistically insignificant." 2015 WL 1498713 at *7-8. I cannot imagine how a different conclusion could be reached judging from one's immigration status alone. I therefore believe that it would be wise to presume the insignificance of one's immigration status.

[34] Allowing consideration of the issue may also diminish the effectiveness of state tort law. Undocumented immigrants are "subject to the full range of obligations" and "entitled to the equal protection" of the civil and criminal laws of this State. *Plyler v. Doe*, 457 U.S. 202, 215 (1982) (noting that the Fourteenth Amendment applies to any person within the jurisdiction of a state). They are accordingly entitled to seek redress in our courts. *See also* Ind. Const. art. 1, § 12 ("All courts shall be open; and *every person*, for injury done to him . . . shall have remedy by due course of law") (emphasis added). However, as noted by the amicus, undocumented immigrants are reluctant to turn to the courts for fear of immigration consequences. Brief of the Ind. Trial Lawyers Ass'n at 12-13. Were one's immigration status to become an issue in civil actions such as this, both parties would be compelled to present evidence as to the likelihood, or lack thereof, of an immigrant's removal. This could potentially transform a tort case into a battle of immigration experts, taking focus away from the injury

to be redressed. Trial would become a much more costly proposition simply because it involved an undocumented immigrant. This would serve as a further disincentive for immigrants to seek relief in our court system.

[35] Moreover, if one's immigration status were to have any impact on the outcome of tort cases, it would certainly be to lower the damages awarded to the injured individual. For this reason, I fear that injecting immigration status into such matters would serve as a bad incentive for employers. Because of the substantial difference between U.S. wages and those paid in neighboring countries, employers would know that they have a chance of paying substantially less in damages to an injured undocumented immigrant. Industries that commonly rely on immigrant labor—industries which, as noted by the amicus, often tend to be dangerous—would have less of an incentive to ensure worker safety. Brief of the Ind. Trial Lawyers Ass'n at 9-10 (noting that undocumented immigrants make up a substantial percentage of the workforce in industries such as construction and meatpacking). Simply put, the deterrent effect of tort law would apply with less force to those who employ undocumented immigrants. As deterring negligent conduct is one of tort law's primary goals, this should not be the case. *Hanson v. St. Luke's United Methodist Church*, 704 N.E.2d 1020, 1027 (Ind. 1998).

[36] Finally, it is important to keep in mind that many of these cases will be tried before juries. Our Rules of Evidence acknowledge that juries can be subject to prejudice. *See* Evid. R. 403. Numerous courts have recognized the obvious potential for prejudice surrounding the issue of immigration, and the majority

acknowledges this potential as well. Slip Op. at 16; *Salas* 230 P.3d at 586-87 (discussing holdings in other courts recognizing the potential for prejudice surrounding immigration). However, despite acknowledging this potential, the majority concludes that because there is "some risk of deportation," "the prejudicial effect of that evidence therefore currently does not outweigh its probative value." *Id.* Thus, the majority appears to conclude that, if evidence of immigration status is relevant, its relevance outweighs its prejudicial effect. This is not an adequate Rule 403 analysis as it fails to take account of the prejudicial effect of the evidence.

[37] Assuming for argument's sake that one's immigration status may be relevant under certain circumstances, in my opinion, this relevance would almost always be outweighed by its prejudicial effect. If immigration status is to be put before the jury at all, the party seeking to introduce evidence of an opponent's immigration status—or seeking to exclude evidence that fails to take account of that status—should first be required to establish that his opponent faces an imminent likelihood of deportation. Only after such a likelihood has been established would the probative value of such evidence have any chance of outweighing its prejudicial impact. While this is not my preferred way of handling the issue, it is an outcome I would be willing to accept.

[38] For the foregoing reasons, I respectfully dissent.